## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STEPHEN P. BOVA,** *et al.* | |
| **Plaintiffs,** | **Case No. 15-cv-1074 (RCL)** |
| **v.** | |
| **THE ISLAMIC REPUBLIC OF IRAN,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

### I.  INTRODUCTION

This action is brought pursuant to the state-sponsored exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq*., which provides "a federal right of action against foreign states" that sponsor terrorist acts. *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 4 (D.D.C.2011). (citation omitted). It arises out of the October 23, 1983 terrorist bombing of the U.S. Marine barracks in Beirut, Lebanon. That building, nicknamed the BLT, housed nearly 400 members of Battalion Landing Team 1/8 and other attached Marines, sailors, and soldiers. The attack represented the deadliest single-day death toll for the United States Marine Corps since the Battle of Iwo Jima and the deadliest single-day death toll for the United States military since January 21, 1968–the first day of the Tet Offensive during the Vietnam War. The detonation tore the four-story building from its foundation, leveling the barracks in seconds and leaving a crater 30 feet deep and 40 feet wide. The attack claimed the lives of 241 servicemen and injured 81 others. Those directly impacted by the blast and their immediate members now bring suit seeking redress against defendants Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS").

## II.   LIABILITY

On February 28, 2018, this Court took judicial notice of the findings of fact and conclusions of law in *Peterson v. Islamic Republic of Iran* ("*Peterson I*"), 264 F. Supp. 2d 46 (D.D.C. 2003) and in *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311 (D.D.C. 2014), and entered judgment for the plaintiffs and against Iran and MOIS regarding all issues of liability. *Bova v. Islamic Republic of Iran*, 1:15–cv–01074 (RCL) (D.D.C. Feb. 28, 2018). ECF No. 32. This Court simultaneously referred this action to a special master for consideration of plaintiffs' claims for damages. *Id.* On April 28, 2020, the special master filed his reports and recommendations with the Court. ECF Nos. 39-108. The parties have filed no objections to the reports and recommendations within the statutorily allotted time. *See* Fed. R. Civ. P. 53(f)(2) (allowing a party to "file objections to—or a motion to adopt or modify—the master's order, report, or recommendations no later than 21 days after a copy is served").

Having established liability, this Court examines the special master's recommended awards.

## III.   DAMAGES

### A.   Standard of Proof

Damages available under the FSIA-created cause of action "include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Those who survived the attack on the Marine barracks in Beirut may recover damages for their pain and suffering as well as any economic losses caused by their injuries. By extension, the estates of those who perished may recover economic losses stemming from the wrongful death of the decedent, while immediate family members may recover solatium for their emotional injuries. Finally, all plaintiffs may recover punitive damages. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 82–83 (D.D.C. 2010).

To successfully press a claim for damages under the FSIA, "the plaintiff must prove that the consequences of the defendants' conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'" *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotations omitted)). As discussed in *Peterson v. Islamic Republic of Iran* (*Peterson II*), 515 F. Supp. 2d 25, 37 (D.D.C. 2007), plaintiffs have demonstrated that the defendants' extrajudicial killing and provision of material support and resources for such killing was reasonably certain to, and indeed intended to, cause injury.

As default winners under the FSIA, plaintiffs "must prove damages 'in the same manner and to the same extent as any other default winner.'" *Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232 (D.D.C. 2012) (quoting *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 160 (D.D.C. 2009)). When assessing these claims, courts carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages." *Rhodes v. United States*, 967 F. Supp. 2d 246, 313 (D.D.C. 2013) (emphases in original) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)). For future damages, a plaintiff must demonstrate entitlement to a "reasonable certainty" or by a preponderance of the evidence, and prove damages by a "reasonable estimate." *Hill*, 328 F.3d at 684. For past losses, a plaintiff must "prove the *fact* of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (emphasis added), yet need only "reasonably prove" the amount of damages. *Hill*, 328 F.3d at 684.

Finally, as state sponsors of terrorism have "made all but certain that evidence does not exist," *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir.

2014), proof may be established by affidavit or declaration and, upon evaluation, the finder of fact "may accept Plaintiffs' uncontroverted evidence as true." *Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 161 (D.D.C. 2013); *see also Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 20 (D.D.C. 2009) ("In default judgment cases, Plaintiffs may present such evidence in the form of affidavits or declarations rather than through live witnesses testifying in open court"); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits.").

B.   Pain and Suffering of Survivors

Assessing damages for physical injury or mental disability implicates a number of factors. Where "death was instantaneous, there can be no recovery." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112 (D.D.C. 2000) (citation omitted); *see also Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 39 n.4 (D.D.C. 2016) (where plaintiffs "submit[ ] no evidence . . . showing that either of the [v]ictims suffered any pain and suffering prior to their deaths in the suicide bombings," damages must be denied). Victims surviving a few minutes to a few hours after the bombing typically receive an award of $1 million. *See*, *e.g.*, *Eisenfeld, et al. v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5 (D.D.C. 2000) (where the Court awarded compensatory damages of $1,000,000 each for "several minutes" of pain and suffering of two decedents who died at the scene of the same bombing); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 8 (D.D.C. 1998) (where $1,000,000 was awarded for three to five hours of pain and suffering); *Elahi*, 124 F. Supp. 2d at 113 (where the Court awarded $1,000,000 for three or four minutes of pain and suffering).

For victims surviving longer periods of time, courts consider "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment

that will remain with the victim for the rest of his or her life." *Peterson II*, 515 F. Supp. 2d at 52 n. 26 (D.D.C. 2007) (citing *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 59 (D.D.C. 2006)). For those injured servicemen, this Court has embraced "the baseline assumption that persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012) (citing *Peterson II*, 515 F. Supp. 2d at 52 n. 26). In *Peterson II*, this Court found a $5 million award for pain and suffering to be appropriate where the evidence revealed a compound fracture on one leg, injuries to the toes on one foot, wounds and scars; where a serviceman suffered a broken jaw, severe flesh wounds and sustained scars on his arms, legs, and face and loss of teeth; or where shrapnel caused soft tissue damage to the chest and sternum area, flash burns, resulting in lingering back problems, internal maladies, and physical scarring. 515 F. Supp. 2d at 54.

Upward deviations from this baseline have been held to be appropriate "in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead." *Relvas v. Islamic Republic of Iran*, No. 1:14-cv-01752 (RCL), 2018 WL 1092445, at * 2 (D.D.C. February 28, 2018) *(*citing *Valore*, 700 F. Supp. 2d at 84). In *Peterson II*, for example, the Court awarded $7.5 million to a serviceman who lost both his sight and hearing; $9 million to a Marine who sustained a skull fracture, shattered cheekbone, eyebrow, and right eye orbit, crushed arms, a broken left leg, bruised right leg, two collapsed lungs, burns on arms and back, and internal bleeding; $7.5 million based on evidence of subdural hematoma, perforated right eardrum, crushed left ankle, collapsed left lung, and other shrapnel wounds that became infected; and $12 million to a serviceman who sustained a broken neck resulting in permanent quadriplegia. 515 F. Supp. 2d at 61.

When confronted with situations involving injuries less severe, the Court has found

downward departures warranted. In *Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150 (D.D.C. 2011), for example, this Court awarded $2 million both to a former Marine who suffered lacerations to his thigh and rib cage and later received a 70% disability rating due to PTSD, *id.* at 156, and to another serviceman who suffered from "lacerations on his left arm, bruising, blurred vision, impaired hearing and a sore head from being hit by concrete." *Id.* Similarly, in *Peterson II*, this Court found $2 million an appropriate award to a serviceman psychologically traumatized and "minimally injured" from small-arms fire besides "nerve pain and foot numbness." 515 F. Supp. 2d at 55. And in *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7 (D.D.C. 2012), this Court awarded $2 million to one serviceman "suffer[ing] hearing loss and severe PTSD as a result of the [Marine Barracks] bombing," *id.* at 12-13, and $2 million to another who also "suffered hearing loss and severe PTSD as a result of the bombing." *Id.* at 13.

Finally, for servicemen suffering emotional, but no physical injury, this Court has adopted a general framework for the calculation of pain and suffering damages whereby they are "typically awarded $1.5 million." *Worley v. Islamic Republic of Iran*, 177 F.3d 283, 286 (D.D.C. 2016); *see also Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012) (awarding $1.5 million in damages to Marine stationed aboard USS Iwo Jima at time of the attack but participated in recovery efforts and suffered from PTSD); *Peterson II*, 515 F. Supp. 2d at 56; *Valore*, 700 F. Supp. 2d at 84.

The Court ADOPTS those recommendations of the special master comporting with the frameworks identified above. The Court will analyze those instances where the special master deviated from these frameworks.

### Special Master Departures from Pain and Suffering Baseline Awards

<u>James K. Hines</u>
(Downward Departure)

James Hines suffered from PTSD for which the VA rated him with a 50% service-connected disability. The VA also rated Mr. Hines with a 20% service-connected disability rating for lumbosacral spine degenerative disc disease with arthritis and 10% for left leg radiculopathy. Mr. Hines attributes his chronic back pain and limb numbness to the strain pulling fellow servicemen from the rubble after the bombing. Medical records reveal that his back condition warranted surgical intervention on at least two separate occasions.

The special master analyzed Mr. Hines' injuries and formulated his recommendation after reviewing this Court's previous awards to similarly wounded servicemen and found that Mr. Hines' injuries do not warrant an award of $5 million. The special master compared Mr. Hines' injuries to those of Pablo Arroyo, who "suffered a broken jaw, severe flesh wounds and scars on his arms, legs and face, [and] a loss of teeth," besides "lasting and severe psychological harm as a result of the attack," and for whom this Court awarded $5 million. *Peterson II*, 515 F. Supp. 2d at 54. The special master further analyzed Mr. Hines' injuries in light of those sustained by Danny Wheeler, who suffered "soft tissue damage to the chest and sternum area, flash burns, and lingering back problems, internal maladies and physical scarring" in addition to "severe psychological problems." *Id.* at 56. Finally, the special master compared Mr. Hines' wounds to those sustained by Randy Gaddo, a claimant in *Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37 (D.D.C. 2012), whose vertebrae were crushed and who was diagnosed at age 41 with the back and neck of a 70-year old man. *Id.* at 46. This Court awarded Marines Arroyo, Wheeler and Gaddo $5 million. Based in part on the VA's 20% service-connected disability rating, the special master concluded that Mr. Hines' injuries, while serious, were not as grave as those sustained by servicemen to whom the Court has awarded the $5 million baseline amount and recommended a reduced award of $3 million.

On this record, the Court is satisfied the special master has "not simply [recommended] what [he] abstractly finds to be fair," *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 34 (D.D.C. 2002), but has properly evaluated Mr. Hines' claims by "look[ing] at damage awards for pain and suffering in other cases brought under the FSIA." *Id*.

The Court therefore agrees with the special master's analysis and ADOPTS his recommendation that James Hines be awarded $3 million in damages for pain and suffering.

Adrian Samuel Mackowski Riega
(Downward Departure)

Besides experiencing dizziness and nausea, determined to be "symptoms of a concussion," Samuel Riega suffered abrasions on his face and shoulder and experienced episodes of vertigo, which prevented him from "stand[ing] up straight" and left him with "no sense of bearing or direction." Because of the blast, Mr. Riega's "hearing was impaired in one ear" and medical records confirm he suffered from "transient tinnitus and subjective hearing loss in his left ear." On May 5, 1984, Mr. Riega "awoke with severe vertigo with secondary nausea and vomiting," and was admitted to the Naval hospital. According to his treating physicians, those symptoms "slowly resolved spontaneously."

The special master recommended Mr. Riega be awarded $2 million in damages for pain and suffering–representing a $3 million downward departure from the baseline established in *Peterson II*. In making this recommendation, the special master compared Mr. Riega's injuries to former Marine Ronald Walker who suffered lacerations to his thigh and rib cage and later received a 70% disability rating due to PTSD, and to Robert Rucker who suffered from "lacerations on his left arm, bruising, blurred vision, impaired hearing, and a sore head from being hit by concrete." In both instances, this Court awarded $2 million. *Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 156 (D.D.C. 2011). The Court similarly awarded $2

million to Charles Frye, a serviceman psychologically traumatized and "minimally injured" from small-arms fire besides "nerve pain and foot numbness," *Peterson II*, 515 F. Supp. 2d at 55, and to Gary Wayne Allison, who "suffered hearing loss and severe PTSD as a result of the [Marine Barracks] bombing," *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 13 (D.D.C. 2012)

The Court finds the special master's recommendation based on sound analysis and ADOPTS the recommendation that Adrian Samuel Riega be awarded $2 million in damages for pain and suffering.

<u>Joseph Vincent</u>
(Downward Departure)

Joseph Vincent was pinned under debris from the explosion, which resulted in cuts to his head and forearm and the formation of a "large mass" on "[his] right shin."  His injuries required that he be transported from Beirut to Italy to receive additional treatment. Mr. Vincent also suffered permanent psychological trauma associated with being buried in the rubble. Finding Mr. Vincent's injuries comparable to those of the servicemen noted above, in *Bland*, *Peterson II*, and *Davis*, to whom the Court awarded $2 million, the special master recommended a downward departure from the *Peterson II* baseline and that Mr. Vincent be awarded $2 million in damages for pain and suffering.

The Court agrees and ADOPTS the recommendation that Joseph Vincent be awarded $2 million in damages for pain and suffering.

<u>Gilbert Horne</u>
(Downward Departure)

Besides suffering from PTSD, Gilbert Horne temporarily lost his hearing in the blast, was struck by shrapnel in his chest, lost his eyebrows and eyelashes from the fire, and had to be hospitalized because his "whole nervous system" was "off."  He testified that he spent "almost three-and-a-half years in a hospital," and has been given a "hundred and sixty" percent VA

disability rating, but has "a 100 percent for PTSD, and for hearing and my feet . . . and my shoulders."

The special master expressed skepticism about Mr. Horne's claims and recommended a downward departure from the *Peterson II* baseline. First, Mr. Horne's physical injuries are not documented and, unlike the psychological trauma he sustained, cannot be presumed to be a natural concomitant of his presence at the blast site. Second, Mr. Horne supplied no medical records relating to the "almost three-and-a-half years" he was ostensibly hospitalized. Third, the severity of Mr. Horne's described ailments is called into question, given that he remained on active duty in the Marine Corps for approximately seven years following the Beirut bombing. While "[c]ourts may rely on uncontroverted factual allegations that are supported by affidavits," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010), the finder of fact "*may* accept Plaintiffs' uncontroverted evidence as true." *Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 161 (D.D.C. 2013) (emphasis added). Here, the special master chose, in light of the scant and often contradictory evidence presented, not to lend credence Mr. Horne's claims, and recommended he receive $2 million in damages for pain and suffering.

The Court concurs with the special master's analysis and ADOPTS the recommendation that Gilbert Horne be awarded $2 million in damages for pain and suffering.

<u>Willie Riddle</u>
(Downward Departure)

As a result of the blast, Willie Riddle sustained an abrasion on his finger, a cut on his head, ringing in his ears, and a temporary loss of hearing. He complained of back pains—a problem he attributes to his participation in the recovery effort. Finding Mr. Vincent's injuries comparable to those of the servicemen, noted above, in *Bland*, *Peterson II*, and *Davis*, to whom

the Court awarded $2 million, the special master concluded a downward departure from the

*Peterson II* baseline was warranted and recommended Mr. Vincent be awarded $2 million in

damages for pain and suffering.

The Court agrees and ADOPTS the recommendation that Joseph Vincent be awarded $2

million in damages for pain and suffering.

C.      Solatium Damages

Solatium damages are available where extreme and outrageous conduct causes grief and

anguish to FSIA plaintiffs closely related to and affected by a victim of terrorism. 28 U.S.C.

§ 1605A(c)(4). *See Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 269 n.8 (D.D.C.

2002) (noting that "'[i]n an intentional homicide case' such as [a terrorist killing], solatium

appears in any event to be indistinguishable from the intentional infliction of emotional distress

for which the District of Columbia does generally allow recovery in tort") (quoting *Wagner v.

Islamic Republic of Iran,* 172 F. Supp. 2d 128, 135, n. 11 (D.D.C. 2001)). Spouses and relatives

in direct lineal relationships are presumed to suffer damages for mental anguish insofar as "[a]cts

of terrorism are by their very definition extreme and outrageous and intended to cause the

highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22

(D.D.C. 2009) (citing *Stethem v. Islamic Republic of Iran,* 201 F. Supp. 2d 78, 89 (D.D.C.

2002)).

A claim for solatium, however, unlike one for lost wages, does not readily lend itself to

quantification using "models and variable." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d

97, 111 (D.D.C. 2000) (*quoting Flatow v. Islamic Republic of Iran*, 999 F. Supp. 2d 1, 32

(D.D.C. 1998)). Courts look for guidance, therefore, in prior decisions.

This Court developed a standardized approach for FSIA intentional infliction of

emotional distress, or solatium, claims in *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d

229, (D.D.C. 2006), where it surveyed past awards and determined that "[s]pouses typically receive greater damage awards than parents [or children], who, in turn, typically receive greater awards than siblings." *Id.* at 269. Relying on the average awards, this Court articulated a framework in which spouses of deceased victims were awarded approximately $8 million, while parents received $5 million, and siblings received $2.5 million. *Id.*; *see also Valore*, 700 F. Supp. 2d at 85 (observing that courts have "adopted the framework set forth in *Heiser* as 'an appropriate measure of damages for the family members of victims'") (quoting *Peterson II*, 515 F. Supp. 2d at 51). As this Court explained, in the context of distress resulting from injury to loved ones—rather than death—courts have applied a framework where "awards are 'valued at half of the awards to family members of the deceased'—$4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 n. 10 (D.D.C.2011) (quoting *Valore*, 700 F. Supp. 2d at 85); *see also Bland*, 831 F. Supp. 2d at 156–58. Children of a deceased victim typically receive an award of $3 million, while children of a surviving victim receive $1.5 million. *O'Brien*, 853 F. Supp. 2d at 46; *Anderson*, 839 F. Supp. 2d at 266; *Bland*, 831 F. Supp. 2d at 156; *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 301 (D.D.C. 2003).

When these awards run afoul of the principle that it is "inappropriate for family members whose designated award to receive a larger solatium award than the injured serviceman's award for pain and suffering," *Davis*, 882 F. Supp. 2d at 15, courts have scaled solatium awards in proportion to awards for direct injuries. *See Goldstein v. Islamic Republic of Iran*, 383 F. Supp. 3d 15, 22 (D.D.C. 2019) ("[S]olatium awards for relatives of victims should be proportionate to the pain and suffering awards to the victims themselves."); *Spencer*, 71 F. Supp. 3d at 28 (noting the "general approach of reducing the solatium awards of family members in rough proportion" to the victim's award for pain and suffering).

Accordingly, where a serviceman was awarded $2 million in damages for pain and suffering, this Court in *Davis*, awarded $1 million to the servicemen's parents and $650,000 to their siblings. 882 F. Supp. 2d at 16. And where a former Marine received $1.5 million in damages for pain and suffering, this Court reduced the solatium awards to $1 million for spouses, $850,000 for parents, $750,000 for children, and $500,000 for siblings. *See Davis*, 882 F. Supp. 2d at 16; *Bland*, 831 F. Supp. 2d at 157; *O'Brien*, 853 F. Supp. 2d at 47.

These numbers, however, are not "set in stone." *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) (quoting *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 74 (D.D.C. 2010)). They are but guidelines designed to promote uniformity in an area not readily receptive to quantification. Considering that an award is designed to offset the profound psychological distress a family member undergoes following the traumatic loss of a loved one, no bright-line rule can incorporate the wide range of situations, evidence, and contexts presented by these cases. And recognizing that "[e]ach victim's suffering is unique, and, therefore, comparing the severity of the mental anguish endured by one victim to another is undoubtedly an inexact science," *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 57 (D.D.C. 2009), courts have deviated from these baseline numbers where circumstances dictate.

Courts have enhanced awards for loss of solatium: (1) in the face of "aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering, such as cases involving torture or kidnapping of a spouse," *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006); (2) where the "evidence establish[es] an especially close relationship," *Spencer*, 71 F. Supp. 3d at 28, when compared to "the normal interactions to be expected given the familial relationship," *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26-27 (D.D.C. 2011); (3) in the presence of "medical proof of severe pain, grief or suffering on behalf of the claimant," *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 403 (D.D.C.

2015); or (4) where the "circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26-27. Downward departures have been imposed where the evidence suggests an attenuated relationship between the victim and his family members. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010). And, "where no evidence is offered to show injury that an award of solatium damages might compensate," solatium awards have been denied. *Roth*, 78 F. Supp. 3d at 405.

The Court ADOPTS those recommendations of the special master comporting with the frameworks established above. The Court will analyze those instances where the special master deviated from these frameworks.

### Special Master Departures from Solatium Baseline Awards

<u>Antonio Hickman</u>
(Downward Departure)

Antonio Hickman seeks solatium damages based on injuries suffered by his father, Gordon Hickman whom the special master recommended an award of $1.5 million, in accordance with *Worley*, 177 F.3d at 286, and *Davis*, 882 F. Supp. 2d at 12. The special master recommended Gordon's son, Antonio, receive $250,000 in solatium damages, a downward departure from the $750,000 award this Court proposed for children of surviving servicemen suffering only psychological injury. *See Davis*, 882 F. Supp. 2d at 16; *Bland*, 831 F. Supp. 2d at 157; *O'Brien*, 853 F. Supp. 2d at 47. The special master supported his recommendation with evidence demonstrating that, until approximately 2012, Antonio had no relationship with his father, could not identify the branch of the military in which his father served, and had no knowledge of the events that transpired in October 1983. The special master correctly observed that solatium damages are not automatically conferred, but are predicated on a finding of a "close relationship" coupled with evidence that the claimant "experienced the severe emotional distress

necessary to sustain a solatium award." *Brown*, 872 F. Supp. 2d at 44. Acknowledging that

Gordon's experiences in Beirut may have ruptured his relationship with his son and entitled him

to some measure of damages, the special master recommended a reduced award given the

"attenuated relationship" between father and son. *Valore v. Islamic Republic of Iran*, 700 F.

Supp. 2d 52, 86 (D.D.C. 2010).

The Court agrees with the special master's analysis and ADOPTS his recommendation

that Gordon Hickman be awarded $250,000 in damages for loss of solatium.

Michael Howell
(Denial of Solatium Damages)

The special master recommended that Michael Howell's claim for solatium damages be

denied. Michael's brother, Malcolm, was a "Dragon Gunner" in Beirut on October 23, 1983, and

participated in the recovery effort, looking for the bodies and remains of fellow Marines.

Michael only discovered that his brother survived the bombing, was on the airport perimeter

when the bombing took place, witnessed the BLT crumble, and "lost 26 good friends that day,"

from one of Malcolm's letters. And except for one fortuitous meeting in Panama City on an

unspecified date, the brothers had no contact for ten years. Michael admitted he "didn't know

where [Malcolm] was or what had happened with him."  The special master found Michael

Howell indifferent to his brother's welfare or to the events that traumatized Malcolm, and

concluded there was "no evidence [] offered to show injury that an award of solatium damages

might compensate." *Roth*, 78 F. Supp. 3d at 405.

The Court concurs and ADOPTS the special master's recommendation that Michael

Howell's prayer for solatium damages be denied.

The Estates of Alice Manley and Mabelean Raymond
(Denial of Solatium Damages)

The estates of Alice Manley and Mabelean Raymond seek solatium damages arising out

of the injuries sustained by their brother, Renard Manley, in Beirut. Renard was awarded $4 million in pain and suffering damages in addition to economic and punitive damages in *Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 155 (D.D.C. 2011). The special master recommended the sisters' claims be denied due to the utter lack of evidence suggesting Alice Manley or Mabelean Raymond were anguished or traumatized by the events that befell their brother in Beirut. Absent any testimony "showing that [either sister] experienced the severe emotional distress necessary to sustain a solatium award," *Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 44 (D.D.C. 2012), the special master concluded that the claimants failed "to show injury that an award of solatium damages might compensate." *Roth*, 78 F. Supp. 3d at 406.

The Court agrees and ADOPTS the special master's recommendation that the solatium claims of the estates of Alice Manley and Mabelean Raymond be denied.

<u>The Estate of Laurence Mattacchione</u>
(Denial of Solatium Damages)

The Estate of Laurence Mattacchione presses a claim for solatium damages arising out of the death of his son, USMC Private Joseph Mattacchione, who was killed in the attack on the Beirut barracks. The special master recommends the estate's claim be denied for lack of evidence.

Laurence's son, Anthony, who testified on behalf of his father's estate, mentions his father only to clarify that Joseph joined the Marine Corps to gain Laurence's respect. Laurence's spouse, Janet, testified only that her son may have joined the Marine Corps right after high school because "he wanted to make his father proud of him." Anne Marie Mattacchione-Chesser, Joseph's sister, stated that Laurence "left" the family when she was 13 years old and believes her brother enlisted "to get [their] father's acceptance and approval." She describes her father as a man who often took out his "frustrations and anxieties" on Joseph and physically

"hurt" him. Nicholas Mattacchione, Joseph's brother confirmed that the reason his brother enlisted was to "prove something" to his father. Nicholas also acknowledged his father was not involved in Joseph's life "to a great extent."

Based on this testimony, the special master found that the Estate of Laurence Mattacchione put forward no evidence, direct or circumstantial, describing a "close relationship" between father and so—"a prerequisite to a solatium award." *Brown*, 872 F. Supp. 2d at 44. This lack of evidence rendered it "impossible" for the special master "through direct testimonial evidence to determine the extent to which [Mr. Mattacchione] has suffered mental anguish as a result" of his son's demise in Beirut. *Roth*, 78 F. Supp. 3d at 405.  The special master concluded that "the complete absence of any testimony demonstrating [Laurence Mattacchione] suffered any anguish," over his son's death, *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 39 (D.D.C. 2016), precluded his estate from recovery.

The Court concurs with the special master's analysis and ADOPTS his recommendation that the Estate of Laurence Mattacchione's claim for solatium damages be denied.

### Janet Margaret Rousseau Childress
(Upward Departure)

The special master recommended Janet Childress receive an enhanced award based on consistent testimony of members of her family describing Ms. Childress' precipitous emotional decline due to the death of her son, Joseph Mattacchione, in Beirut. Following notification that her son perished in the bombing, Ms. Childress turned to alcohol, attempted suicide, required hospitalization to alleviate her deteriorating mental condition, and engaged in a series of abusive and threatening relationships. The special master found a nexus between Joseph Mattacchione's death and Ms. Childress' long-term deterioration and recommended she receive a $1 million enhancement to the $5 million baseline award established in *Heiser*.

The Court concurs with the special master's analysis and conclusion and ADOPTS his recommendation that Ms. Childress receive $6 million in damages for loss of solatium.

## Howard Nash
### (Downward Departure)

Howard Nash seeks solatium damages for the injuries sustained by his brother, John W. Nash, in the Beirut bombing, who was awarded $2 million in compensatory damages for pain and suffering in *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 13 (D.D.C. 2012). Based on Howard Nash's testimony that he only saw John "a couple of years before he shipped out" and that he did not see his brother for 14 years after the Beirut incident,  the special master concluded the brothers' relationship was "attenuated," under *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010), and recommended a downward departure of $400,000 from the $650,000 award established in *Davis*, 882 F. Supp. 2d at 16.

The Court agrees and ADOPTS the special master's recommendation that Howard Nash be awarded $250,000 in solatium damages.

## Sheila Leslie
### (Denial of Solatium Damages)

Sheila Leslie sues for solatium damages arising out of injuries sustained by her half-brother, Lance Corporal Samuel Palmer on October 23, 1983, who was awarded $4.5 million in *Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 155-56 (D.D.C. 2011). The special master recommended denying Ms. Leslie's claim. His recommendation is based on Ms. Leslie's inability to recall the first time she and her half-brother met, coupled with her testimony that she first learned that Samuel was her half-sibling in 1980 and first learned of the Beirut bombing through a newspaper clipping. The special master found that Ms. Leslie failed to demonstrate she and Samuel Palmer had any relationship, much less a "close relationship," which is "prerequisite to a solatium award," *Spencer*, 71 F. Supp. 3d at 31 (quoting *Brown*, 872 F. Supp. 2d at 44), or

that she suffered any anguish because of her brother's ordeal in Beirut.

The Court concurs and ADOPTS the special master's recommendation that Sheila Leslie's claim for solatium damages be denied.

### Gary Wigglesworth
### (Denial of Solatium Damages)

Gary Wigglesworth's "estate" seeks solatium damages arising out of the death of Gary's brother, USMC Lance Corporal Dwayne Wigglesworth, who was killed in the Beirut bombing. The special master denied damages due to the lack of any evidence demonstrating Gary's estate was ever formally opened or that an administrator had been appointed. The "power of an estate to bring and maintain legal claims" is a "threshold question," *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12 (D.D.C. 2011), necessary to "establish the estate's standing." *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 85 (D.D.C. 2017). Gary Wigglesworth's failure to meet this threshold precludes recovery.

The Court agrees these failures are fatal to Gary Wigglesworth's claim and ADOPTS the special master's recommendation that damages be denied.

### Stacy Wolcott
### (Denial of Solatium Damages)

Stacy Wolcott prays for solatium damages arising out of injuries sustained by her brother, Mark Wolcott, during the Marine barracks bombing in Beirut. The special master recommended Ms. Wolcott's claim be denied on the grounds that she was born after the October 23, 1983 attack. *See Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 15 (D.D.C. 2012) ("a plaintiff bringing an action under § 1605A must have been alive at the time of the attack in order to collect solatium damages.").

The Court agrees and ADOPTS the special master's recommendation that Stacy Wolcott's claims be denied.

<u>Charles A. West and Jeremiah West</u>
(Downward Departure)

Charles A. West and Jeremiah West bring claims for solatium damages arising out of the death of their father, Lloyd Dennis West, who was killed in the Beirut attack and awarded damages in the matter captioned, *Bland v. Islamic Republic of Iran*, 1:05-cv-2124 (RCL). The special master found insufficient evidence to warrant the $3 million baseline award established in *Heiser*, *Davis*, and *O'Brien*, for children of servicemen killed in Beirut, recommending, instead, a downward departure of $2.5 million, or $500,000 each.

Charles West, who was two years old when his father died, was ten before he saw a photograph of his father. He lamented growing up without a father and being unable to introduce his own children to their "flesh and blood" grandfather. Charles attributes his poor academic record, profound psychological deterioration, and "many, many, many years" of "intensive therapy" to his father's demise. His brother, Jeremiah West, was five when Lloyd West died. Jeremiah blames the "hellish" upbringing he experienced at the hands of his stepfather on his father's absence and suggests his passing is the reason Jeremiah was later imprisoned for 11 years and became an alcoholic. The special master found the brothers' claims too tenuous to support the baseline award. The finding was premised largely on the brother's youth at the time of Lloyd West's death, on the utter lack of any documentation supporting Charles' purported mental decline, and the questionable nexus between Lloyd's death and Jeremiah's criminal activities and alcohol abuse.

The Court agrees with the special master's analysis and ADOPTS his recommendations that Charles West and Jeremiah West each receive $500,000 in solatium damages.

<u>Adela Vasquez</u>
(Denial of Solatium Damages)

Adela Vasquez's solatium claim arises out of the injuries sustained by her half-brother,

Mario H. Vasquez, during the Beirut bombing. The special master recommended her claim be denied due to a lack of evidence Ms. Vasquez enjoyed any relationship, much less a "close" one, with her brother—"a prerequisite to a solatium award." *Brown*, 872 F. Supp. 2d at 44. Ms. Vasquez admits having no recollection of her brother's deployment or of the October 23, 1983 bombing, and offered no testimony describing how her brother's presence in Beirut affected her. The special master concluded this complete lack of evidence rendered it "impossible through direct testimonial evidence to determine the extent to which she has suffered mental anguish as a result." *Roth*, 78 F. Supp. 3d at 405.

The Court agrees and ADOPTS the special master's recommendation that the solatium claim of Adela Vasquez be denied.

The Estate of Edward F. Simmons
(Denial of Solatium Damages)

The Estate of Edward F. Simmons seeks solatium damages arising out of the injuries sustained by Charles Simmons Jr., who was injured in the Beirut attack and awarded $1.5 million in *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 21 (D.D.C. 2012). Testimony to support the estate's claim was given by Edward's sister, Cynthia Bacon, who failed to describe any relationship that may have existed between Edward and Charles—"a prerequisite to a solatium award." *Brown*, 872 F. Supp. 2d at 44. After finding it "impossible through direct testimonial evidence to determine the extent to which Edward Simmons has suffered mental anguish as a result" of his brother's experiences in Beirut, *Roth*, 78 F. Supp. 3d at 405, the special master recommended the estate's claim be denied.

The Court agrees and ADOPTS the special master's recommendation that the Estate of Edward F. Simmons' claim for solatium damages be denied.

D.     Economic Damages

28 U.S.C. § 1605A, like its statutory predecessor 28 U.S.C. § 1605(a)(7), establishes a

cause of action for economic damages resulting from an act of state-sponsored terrorism. In

*Bland*, this Court awarded economic damages for lost wages resulting from injuries suffered in

the 1983 Marine Barracks bombing and for loss of accretions to the estate resulting from the

wrongful death of decedents in the attack. 831 F. Supp. 2d at 156. Loss of accretion damages

"are calculated by estimating a decedent's future earning potential based on the individual's

work and education and adjusting that amount to account for inflation, rise in productivity, job

advancement, and personal consumption." *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d

78, 87 (D.C. 2002) (citing *Flatow*, 999 F. Supp. at 28).

Before authorizing a recovery for economic losses, this Court must be presented with

evidence which affords a reasonable basis for measuring the claimant's loss. Although

mathematical exactitude is often impossible, proof of economic losses should be established with

reasonable certainty and not grounded in speculation, contingency, or conjecture.

Seventeen *Bova* claimants filed claims seeking economic damages. Each supported their

prayers for relief by attaching a forensic report prepared by Dr. Jerome Paige. These reports

purport to supply an estimate that will best compensate those injured as well as the estates of

deceased servicemen for financial losses resulting from the October 23, 1983 terrorist attack.

These estimates primarily focus on the losses associated with foregone employment

opportunities and involuntary periods of future non-employment, and incorporate statistical

averages, actuarial tables, and national data schedules. Dr. Paige's reports blend these averages,

tables, and schedules with the serviceman's personal information, such as "military training,

educational aspirations, and occupational outlook data," to arrive at a fair estimate either of

"economic loss" or, absent any employment history, of "loss of economic capacity."

The special master objected to many of the methodologies employed by Dr. Paige. He highlighted those instances where the forensic reports exaggerate the average lifespan of an individual claimant, where projected lost income after being discounted to present value was *greater* than the lost income before discount, or where the calculations assumed the claimants would have remained in the military until 1999–2002, despite evidence to the contrary. The special master questioned the viability of extrapolating information from responses to a questionnaire that, in most instances, were incomplete, evasive, or directly contradicted by sworn testimony, to calculate economic losses. The special master was skeptical about wildly inflated economic projections that assumed servicemen, who had not graduated high school and demonstrated no academic inclinations, would have become medical doctors or attorneys had they survived.

Besides underscoring the flaws in Dr. Paige's projections, the special master took great pains to uphold Dr. Paige's projections where methodologically sound and inclusive of well-settled assumptions on inflation, rise in productivity, job advancement, personal consumption, net earnings, and application of the discount rate. In that spirit, the special master recommended adoption of the economic reports of Gary Vasser, the Estate of Nicholas Baker, the Estate of William Elliot Jr., the Estate of Joseph Mattacchione, the Estate of Timothy McNeely, the Estate of Richard Morrow, and the Estate of Marc Cole. It must be noted that although the special master found Mr. Cole's claim to economic damages to be colorable, his estate has not been formally opened, and no administrator appointed. The special master concluded that Mr. Cole lacks the requisite standing "to bring and maintain legal claims," *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12 (D.D.C. 2011), and recommends his claim for loss of accretions be denied.

When analyzing the claims of claimants James Brown, Malcolm Howell, John Kinslow,

Jack MacDonald III, Rodney Rodham, and Anthony Franks, the special master enumerated the numerous flaws he discovered in each of their respective economic reports. Without discounting the legitimacy of their individual claims, the special master concluded that, absent additional information addressing his stated concerns, he could not recommend damages with the requisite certitude. Since publication of the special master's reports, no supplemental filings have been made on these claimants' behalf addressing the identified infirmities.

Apropos of the claims of the Estate of Jimmy Cain, the Estate of James Faulk, the Estate of Miguel Comas, and the Estate of Edward Kimm, the special master took issue with the assumptions underpinning Dr. Paige's economic loss projections. He found nothing in the record, for example, supporting the proposition that Jimmy Cain or James Faulk, had they lived, would have been licensed physicians. Miguel Comas, by all accounts, aspired to be a "mechanic."  In calculating Mr. Comas' economic losses, Dr. Paige failed to inquire whether Mr. Comas considered a profession as an auto mechanic, an aircraft mechanic, or an electrical mechanic–each with different skill sets and widely divergent pay ranges. Rather than recommend their claims be denied, the special master averaged the ages, ranks, pay grades of, and damages awarded to dozens of servicemen killed in Beirut. Based on those calculations, he recommended what he found to be an appropriate amount of economic loss of accretions to the estates of Jimmy Cain, James Faulk, and Miguel Comas. Regarding Edward Kimm's claim, the special master found that Dr. Paige erroneously added ten years of retirement income to Edward Kimm beyond his expected lifetime, and adjusted the final award accordingly.

The errors uncovered by the special master demonstrate that "[e]xpert economic testimony in a wrongful death case represents only a guideline and may not be adopted at its face value as the sole basis for the determination of damages for death." *Flythe v. District of Columbia*, 4 F. Supp. 3d 222, 236 (D.D.C. 2014) (quoting *Thomas v. Potomac Elec. Power Co.*,

266 F. Supp. 2d 687, 695 (D.D.C. 1967)). The Court agrees with the analyses provided by the special master with respect either to lost wages resulting from injuries suffered in the attack or to loss of accretions to the estate resulting from the wrongful death of decedents in the attack. *See Valore*, 700 F. Supp. 2d at 85. The Court, therefore, ADOPTS without modification the damages awarded for economic losses recommended by the special master.

E.   Punitive Damages

In assessing punitive damages, this Court has observed that any award must balance the concern that "[r]ecurrent awards in case after case arising out of the same facts can financially cripple a defendant, over-punishing the same conduct through repeated awards with little deterrent effect," *Murphy*, 740 F. Supp. 2d at 81, against the need to deter "the brutal actions of defendants in planning, supporting and aiding the execution of [terrorist attacks]." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 184 (D.D.C. 2010). To accomplish this goal, this Court—relying on the Supreme Court's opinion in *Philip Morris USA v. Williams*, 549 U.S. 346 (2007)—held that the calculation of punitive damages in subsequent related actions should be directly tied to the ratio of punitive to compensatory damages set forth in earlier cases. *Murphy*, 740 F. Supp. 2d at 81–82. In *Murphy*, this Court applied the ratio of $3.44 for every dollar of damages established in *Valore*. *Id.* at 82–83 (citing *Valore*, 700 F. Supp. 2d at 52); *see also Bland*, 831 F. Supp. 2d at 158. Here, the Court will again apply this same $3.44 ratio, which has been established as the standard ratio applicable to cases arising out of the Beirut bombing. Application of this ratio results in a total punitive damages award of $1,199,590,880.

IV.   **CONCLUSION**

The compensation the Court awards today has long been overdue. However, it is imperfect and incomplete—no sum of money can fully compensate these plaintiffs for their losses. Nor can a monetary judgment meaningfully punish those who have perpetrated these acts.

Monetary compensation is, nevertheless, the only tool available to this Court to accomplish both of those ends. And despite its doubts, the Court hopes this award provides some degree of solace to those victims and will equally have some deterrent effect on those states that would utilize terror as a means of advancing their political and religious goals.

A separate order shall issue this date.

SIGNED this 31st day of May, 2020.

*/s/Royce Lamberth*
Royce C. Lamberth
United States District Judge